Filed 3/17/26  P. v. Humphrey CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C101906 |
| Plaintiff and Respondent, | (Super. Ct. No. 02F02888) |
| v. | |
| ROY LEE HUMPHREY, | |
| Defendant and Appellant. | |

Defendant Roy Lee Humphrey appeals the trial court's denial of his petition for resentencing under Penal Code section 1172.6 after an evidentiary hearing.  (Statutory section citations that follow are to the Penal Code unless otherwise stated.)  Counsel for defendant filed a brief seeking our independent review of the matter pursuant to *People v. Delgadillo* (2022) 14 Cal.5th 216 (*Delgadillo*) to determine whether there are any arguable issues on appeal.  Separately, defendant filed a supplemental brief.

In his brief, defendant argues substantial evidence does not support the trial court's finding he remained guilty of felony murder as the actual shooter in an attempted

1

robbery. Defendant also argues he was improperly denied post-conviction discovery. He asserts the trial court erroneously admitted police reports only for their impeachment value. Defendant points to several alleged errors that took place in his trial. Finally, defendant asserts the trial court and his trial attorney did not properly follow juvenile court procedural rules during the original proceedings. Rejecting all of defendant's claims of error, we affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

The amended information charged defendant with murder (§§ 187, subd. (a), 189), attempted robbery (§§ 664/211), and assault (§ 245, subd. (a)(2)). As to the murder and attempted robbery, the amended information alleged the enhancement defendant personally used a firearm. (§ 12022.53, subd. (b).) The information further alleged the murder was committed while the defendant was engaged in the attempted commission of robbery. (§ 190.2, subd. (a)(17).)

We provide a summary of the underlying facts which are set forth in the appellate opinion in defendant's original appeal solely for context and do not otherwise use those facts to resolve this appeal. (§ 1172.6, subd. (d); see *People v. Humphrey* (May 4, 2011, C052744) [nonpub. opn.].)[1] One of two men approached several other men playing poker on their front porch. (*Ibid.*) When the approaching man asked to join in and was refused, he pulled out a gun and demanded money. (*Ibid.*) After a scuffle, shots rang out and one of the poker players was killed and another was injured. (*Ibid.*)

At his original trial in 2006, the jury found defendant guilty of murder (§§ 187, subd. (a), 189); attempted robbery (§§ 664/211); and assault (§ 245, subd. (a)(2)). The jury found the firearm and special circumstance allegations true. The trial court sentenced defendant to 25 years to life in state prison for the murder plus 10 years for the

---

[1] We incorporate this opinion by reference on our own motion.

attached firearm enhancement.  The sentences on the remaining charges are not germane to this appeal.

Defendant appealed, and a different panel of this court affirmed the judgment. (*People v. Humphrey, supra*, C052744.)

In 2019, defendant filed a petition under section 1172.6 to have his murder conviction vacated and for resentencing.  The trial court denied his petition at the prima facie stage, and a second panel of this court originally affirmed that decision but later reversed and remanded the case for an evidentiary hearing after our Supreme Court granted defendant's petition for review and directed this court to reconsider the matter. Upon remand at the evidentiary hearing, the prosecution submitted the original trial transcript as evidence.  Defendant sought to introduce several other documents: "Defense Exhibits A through K" without any recitation as to why or how those items of evidence were admissible.

At the hearing on the petition, the trial court stated it would use the District Attorney's letter to the Parole Board, which listed all of coconspirator Deshawn Fisher's juvenile adjudications and adult convictions to impeach Fisher.  Fisher is also referred to as Swanee in the trial transcript.  The trial court also admitted the police reports proffered by defendant, but because they were hearsay, the trial court only admitted them for their impeachment value under Evidence Code section 1202.  Defendant, who was proceeding pro se, did not object to this ruling.

The trial court considered two of defendant's discovery motions for evidence of Fisher's criminal history for purposes of impeachment, and evidence there was no gambling business permit issued to the property at which the crime occurred.  The trial court denied defendant's motions to compel discovery, stating it was unaware of any authority to compel discovery in a section 1172.6 proceeding.  In any event, the trial court noted it had already agreed to consider all of Fisher's prior convictions as impeachment evidence, and it would assume there was no gambling license for the home

3

at which the altercation occurred, which defendant confirmed is what he was trying to demonstrate through the discovery request.

As required by our standard of review, we describe the relevant evidence admitted at the hearing on the petition (i.e., the trial testimony from the 31-day trial) in the light most favorable to the judgment:

Around 8:08 p.m. on the evening of January 25, 2002, police officers were dispatched to a residence. There, officers found the murder victim, V.J., lying on the porch with two gunshot wounds and no pulse. A second shooting victim was transported to the hospital for treatment.

Officers recovered a revolver, two live .38 caliber rounds, a black cap, and a jacket on the ground in the driveway. Fisher's DNA was found in the black cap. Officers further located two bicycles outside the gate. A spent bullet was found on the porch where the shooting occurred.

The two bullets recovered from the victim's body were .38 caliber. The criminologist was unable to ascertain whether these bullets were fired from the same gun. The criminologist testified "only Rossi weapons manufactured by Emo Rossi (phonetic), a Brazilian manufacturer, matched the class characteristics" of these bullets. The criminologist excluded the gun found on the driveway as the source of the bullets from the victim. Thus, the murder weapon remained at large.

B.V.S. testified he was sitting outside of M.J.'s house playing cards for money with several people, including V.J. (the murder victim) and A.J. The stakes were about $15 to $20 per person and the money was primarily in quarters and sitting on the table.

B.V.S. testified that the person who shot him and killed V.J. appeared suddenly and wanted to play with them. B.V.S. did not know what the person said because the person spoke English, which B.V.S. said he did not understand, but B.V.S. described the tone of the conversation as angry. The intruder then pulled out a gun and A.J. pushed the intruder in response. A.J. and V.J. attempted to get the gun from the intruder while the

4

other men at the table got up and ran away. B.V.S. hit the intruder with a chair two or three times, aiming at the intruder's gun. The night of the incident, B.V.S. told the responding officers he swung his chair and hit the intruder on the head. The intruder shot B.V.S. and then shot V.J.

B.V.S. described the shooter as a black man, about 19 or 20 years old, who weighed about 140 pounds. When he observed one in-person lineup, B.V.S. reported he did not recognize anyone and that the person who attacked him was a little taller and skinnier than the men in the lineup. In a second in-person lineup, an officer reported B.V.S. stated that either number four or number five was the shooter. B.V.S. testified he did not write on the forms as he cannot write, and he did not tell the officers that the shooter was number four or number five but rather pointed to number two -- defendant.

A.G. testified that he was also on the porch at M.J.'s home playing poker when a strange person appeared. He first described him as a black man, five and a half feet tall, and about 21 years old, and wearing a black jacket. In prior statements and testimony, A.G. also described the shooter as six feet tall. He also variously reported his weight as 160 pounds, 120 pounds, and 130 pounds.

A.G testified his friends told him the man wanted to play with them. The man then pulled a pistol out of his jacket and shot "towards the porch upwards." When A.J. and M.J. attempted to grab the pistol, the man shot V.J.

A.G. testified the man had a black .38 caliber gun. A.G. also observed B.V.S. hit the shooter in the head with a chair. Next, the man shot B.V.S. A.G. testified he saw a second black man out front by the gate, but when he gave a statement to a responding officer at the time of the murder, he said had not seen this but learned it from other sources of information. A.G. then ran away. When he returned about 10 minutes later, he saw a .38 caliber pistol on the ground behind the house. Previously, A.G. told the officer he did not see V.J. or B.V.S. get shot because he ran away.

5

R.G. testified he was also present with the men playing cards for money.  The first thing he remembered about the incident was that two people arrived on bicycles.  One of them came up to where they were playing and the other one stayed by the gate.  The man who approached said he wanted to play and A.J. told him he could not and told him to leave.  R.G. testified in an earlier proceeding that the first man had something shining in his teeth.  R.G. heard the man on the porch say he wanted money and then A.J. struck the man in the face.  At the scene of the incident, A.G. told the responding officer he heard the young man demand in English, "Give me the money."

At that point, R.G. turned around and saw a second man standing by the gate.  The second man came running in and R.G. started to fight with the second man.  Two or three seconds later, R.G. heard shots.  The man R.G. was fighting with ran away into an alleyway.  R.G. noticed the man dropped something while they were fighting and when R.G. found it, it was a revolver.  The second man also lost his jacket and cap at the scene.

On his way back to the house, R.G. saw the first man with a gun running away in the same direction as the second man.  When he returned to the porch, V.J.'s body was on the ground and B.V.S. was laying on the ground and had been shot in the leg.  No one else on the porch had a gun that night.

R.G. testified the first man was black, approximately 20 to 22 years old, and about five foot ten to six feet tall, wearing a jacket and a cap.  The second man was also black, between 18 and 20 years old, and about five foot eight inches to five foot ten inches tall with a normal build.  At the scene of the murder, R.G. reported to the police that he heard the first man say, "give me the money."

When presented with two in-person lineups, R.G. was unable to identify anyone in the first line up but indicated one of the men in the second line up resembled one of the men involved (defendant), but he was not sure.

A.J. was the fourth man to testify about the poker game.  He said a man came up to the game from the street and said he wanted to play cards.  Another man was standing

6

in the driveway with his bicycle.  When A.J. and his brother said no, the man responded, "I got the money, I want to play," and then the man brought out a gun and started shooting.  The man then ran away.

A.J. testified that after the shooting started, the second man dropped his bike and started to come up to the porch.  R.G. jumped up to grab him.

A.J. described the shooter as approximately 19 to 20 years old, a "negro," wearing a black jacket.  He described the other man as an African American who was not as tall as the first man and approximately 17 years old.

The night of the murder, A.J. told officers he was not present at the murder because he was afraid the person might hurt him.  At a hearing prior to trial, he affirmatively identified defendant as the shooter.

D.E., a woman that lived in the same house as defendant and who dated his sister, testified she saw defendant with a handgun the day he got shot.   She described the gun as a revolver.  Defendant told D.E. that his friend Fisher also had a revolver.

D.E. said defendant left the house the evening of the shooting.  D.E. spoke with an investigator in 2005 in a recorded interview and excerpts from that interview were played to the jury.

D.E. told the investigator defendant left with Fisher either riding bikes or on foot. When defendant returned later that night, he was bleeding from the head and leg. Defendant told D.E. that he and Fisher "went to go play, uh, shoot dice or something . . . and dudes like got into it," and he got shot in the leg while scuffling with a guy.  D.E. also told the investigator that defendant had told her that he went over to rip some guys off, it went bad, and he had shot himself in the leg with his own gun.  She told the investigator it was some Mexicans.

At trial, D.E. testified defendant told her he had been robbed, and he lost his wallet during that robbery.  Despite his claim, D.E. testified the wallet was not missing and she saw it on the nightstand in his room.  After he was arrested, officers found a worn black

7

wallet in defendant's bedroom containing several items indicating the wallet belonged to him.

The day of the murder, defendant was treated for a gunshot wound to the leg and a closed head injury. Defendant told the nurse that he was assaulted, hit in the back of the head, and had a gunshot wound to his leg. Defendant also told a responding officer he was walking down the street and was hit from behind and his wallet was taken. A 911 call reporting this alleged crime was made at 8:59 p.m. on the day of the shooting. The caller claimed the assault happened at approximately 6:59 p.m.

Conspirator Fisher was jointly charged for the murder. Fisher testified he knew defendant for a couple months prior to the shooting and had seen defendant with a .38 caliber revolver. On the day of the shooting, he met up with defendant and the two left to go pick up some money that was owed to defendant by "some Asians." Defendant told Fisher there might be some problems. The two rode bikes to get the money. Fisher had six gold teeth in the front of his mouth that day.

On the way, defendant and Fisher discussed stopping to pick up a .38 caliber pistol from a third man's house. At the time Fisher was also armed. At trial, Fisher testified defendant went into the third man's house and came out with a pistol, gave it to Fisher, and the two left. They then went to the Asians' house where the Asians reportedly told defendant they would pay him the money they owed him.

Next, the two men rode down the street and then went into a gate to another house where defendant had said people often played cards. Fisher testified that when they were about a block from the house, defendant told him they might be able to "lick 'em, rob them." Fisher claimed he told defendant not to do it but rode along with him anyway. Defendant walked up to the porch and started to talk to the victims Fisher described as "some Mexicans."

8

Next thing Fisher knew, he heard some commotion, looked up, and a Mexican hit him in his face. Fisher fell off his bike and started fighting with that man. The man who hit him pulled off Fisher's jacket and then Fisher ran away. He then heard a couple shots.

Fisher told police substantially the same story in a phone call to detectives, twice on the phone and once when he surrendered himself.

At trial, Fisher identified the pistol and hat that were found on the ground at the scene of the crime as his. Fisher identified a photograph of a bicycle found at the scene as the one he was riding and testified he left it at the scene. He also identified a photograph of the mountain bike defendant was riding that night that was also found at the scene.

Fisher claimed he did not see defendant again for a couple weeks after the shooting. In that meeting, defendant told Fisher he "probably hurt somebody, and one of them might have died."

Prior to being arrested, Fisher heard that defendant accused Fisher of shooting defendant in the leg. Fisher "felt it was wrong" for defendant to accuse him, and shortly after he learned this, Fisher spoke with police and identified defendant as the shooter.

Although originally subject to the death penalty, Fisher pleaded guilty to manslaughter for a stipulated 10-year term.

Defendant's and Fisher's fingerprints did not match any latent fingerprints obtained at the scene.

The parties stipulated defendant had previously testified he never met Fisher prior to being in court with him.

In the defense case, defendant's mother testified Fisher had never been to her house or been associated with defendant. She also testified D.E. was hostile to her family after she broke up with the mother's daughter.

She testified about the night defendant came home with a gunshot wound and head wound and that his sister took him to the hospital. Defendant told her he had been

9

mugged. Later that night, she called 911 to report her son had been robbed. She also testified defendant had two different wallets, only one of which was stolen. Defendant's mother said she had evicted Fisher's relatives from the home they were living in because they were not paying rent.

Defendant also presented the testimony of N.M. who said Fisher came home the night of the shooting with another man, O.B. N.M. purportedly heard Fisher tell O.B. that he would have to find somebody to cover up for him and she heard O.B. respond, well, you better not say my name. N.M. also heard O.B. say he did not mean to shoot anyone and that it had been an accident. N.M. also said Fisher and O.B. talked about how they had robbed someone earlier that day and shot him. They talked about blaming the robbery victim (i.e. defendant) for the shooting. She did not tell anyone this story for over three years because she feared for her life and her children's lives. N.M. also testified she never saw defendant and Fisher together.

Defendant's oldest sister, L.H., testified defendant came to her house and said he had been shot and hit on the head. She also claimed she did not know Fisher, that defendant did not speak of him, and that defendant never rode a bicycle.

Defendant's other sister, E.H., also testified she had never seen defendant riding a bicycle in his life. She also asserted defendant was unable to run more than half a block. She knew who Fisher was, but she had never seen him at her house. She testified she never knew defendant to have a gun or rob anyone. On the day of the shooting, defendant came home and said he was shot, hit in the head, and robbed. She claimed defendant had a different wallet after he was shot and robbed because she gave it to him.

M.C. testified the night of the shooting he noticed a lot of yellow tape on his drive home from the store. Later that night, Fisher and defendant showed up at his house. Fisher appeared nervous.

M.C. heard Fisher say to defendant, "Man, why you leave me." In response, defendant twice said, "I shot the mother fucker." Fisher replied, "You still didn't have to

10

leave me." M.C. also heard defendant say, "I didn't mean to leave you," and that "I don't know if I killed the mother fucker, but I shot him." Fisher also said that he had dropped his gun when he was trying to fight someone off.

M.C. submitted a tip to police to collect the reward for information leading to the arrest for the crimes. He recognized his son's bike from the photograph on the flyer. M.C. also said he went to the home where the murder was committed and spoke with the people there. They said they knew it was defendant because he had been gambling with them on a regular basis.

M.C. convinced Fisher to turn himself in. While they were driving to do so, they saw defendant walking down the street. They stopped the car and Fisher got out of the car and spoke with defendant. Defendant tried to persuade Fisher not to turn himself in. In that conversation, M.C. testified he heard Fisher tell the defendant, "You know, you shot yourself, so why you keep saying that I shot you?"

At the evidentiary hearing, the trial court identified the relevant issue as whether "[defendant] could not presently be convicted of murder or attempted murder because of changes to Sections 188 or 189 of the Penal Code made effective January 1st, 2019."

The trial court continued, "Under Penal Code Section 189 murder perpetrated -- felony murder perpetrated or committed in the perpetration or attempt to perpetrate a number of listed crimes, including robbery, that is felony murder, and then [section] 189(e) says, 'A participant in the perpetration or attempted perpetration of a felony listed in subdivision (A)', which again includes robbery, 'in which a death occurs is liable for murder only if one of the following is proven.' And (e)(1) states: 'The person was the actual killer.'

"[Section] 1172.6(d)(3) holds that at the hearing the burden of proof is on the [p]rosecution to prove beyond a reasonable doubt that [defendant] is guilty of murder under California law as amended by the changes to Penal Code Sections 188 and 189, effective January 1st, 2019.

11

"The Court has read and considered the entire transcript in this case as well as the exhibits submitted by [defendant]. Again, the record was in excess of 3,000 pages. The Court's also read and considered all of the briefing submitted by both parties.

"Although, there is not necessarily a single piece of definitive evidence or a quote 'smoking gun', after considering all of the evidence in this case in its totality, the Court finds that the evidence that [defendant] was the actual shooter, was the actual killer, was -- is and was overwhelming and such the Court is convinced beyond a reasonable doubt that [defendant] was the actual killer in this offense or this case." In light of this finding, the trial court declined to consider defendant's age. The trial court denied the petition.

Defendant timely appealed.

## DISCUSSION

Under *Delgadillo*, we must "evaluate the specific arguments presented in [defendant's supplemental brief]," but we are not compelled to undertake an "independent review of the entire record to identify unraised issues." (*Delgadillo, supra*, 14 Cal.5th at p. 232.)

Substantial Evidence

In his supplemental brief, defendant argues insufficient evidence shows he was guilty of felony murder as the actual killer. Defendant also argues this was not a robbery gone bad, but a legal poker game where a fight broke out. Defendant claims the trial court was not required to give collateral estoppel effect to the jury's findings he committed the murder in the context of an attempted robbery, and that because the law of robbery has materially changed since his conviction (now requiring something be taken from the victim), the trial court should not have relied upon the jury's finding he committed the murder while committing an attempted robbery.

We begin by noting nothing suggests the trial court based its ruling on the doctrine of collateral estoppel, but rather, the court "read and considered the entire transcript in

12

this case" and the other evidence proffered to come to its findings anew. Thus, we decline to address defendant's arguments related to collateral estoppel and examine the evidence presented to ascertain whether substantial evidence supports the trial court's findings. (See *People v. Njoku* (2023) 95 Cal.App.5th 27, 41 [After an evidentiary hearing in the trial court, a court of appeal reviews the trial court's denial of a section 1172.6 motion to determine if the ruling is supported by substantial evidence].)

Senate Bill No. 1437 (2017-2018 Reg. Sess.) was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

As relevant here, the bill amended section 189, subdivision (e). That section now provides, "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [which includes robbery] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

In reviewing a trial court's findings that the prosecution has proven defendant is guilty of murder under current law, "[w]e review the trial judge's factfinding for substantial evidence. [Citation.]" (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) "We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' [Citation.] Our job on review is different from the

13

trial judge's job in deciding the petition.  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt."  (*Ibid.*)

Ultimately, the question defendant presents boils down to two key issues.  First, is there substantial evidence to support the trial court's findings beyond a reasonable doubt he was the actual shooter?  Second, is there substantial evidence to support the trial court's findings beyond a reasonable doubt defendant was engaged in an attempted robbery at the time he killed the victim?  We conclude the answer to both questions is "yes."

Defendant looks to the victims mixed descriptions of the shooter to assert substantial evidence does not support the trial court finding that he was the actual shooter in an attempted robbery.

As the trial court noted, there are multiple items of evidence that provide substantial evidence to support the finding defendant shot and killed V.J.

First, it is uncontested that an African American man came up to the porch with a gun while several men were playing poker and ultimately shot one of the poker players to death.

While most of the men on the porch could not identify the shooter, B.V.S. claimed he identified defendant as the shooter in the lineup.  In addition, at a prior hearing another of the victims affirmatively identified defendant as the person who shot him.

D.E.'s testimony provided further evidence defendant was involved in this killing. According to her, defendant had a revolver the day of the shooting, and defendant left with Fisher riding bikes or on foot that night.  The men who appeared at the house where the shooting took place arrived on bicycles

14

Defendant returned home later that night with a gunshot wound and a head wound consistent with the victim's statement he hit defendant in the head with a chair. D.E. also testified defendant told her he went over to rip off some guys (i.e., "Mexicans"), and it went bad. D.E. also cast doubt on defendant's alibi claim he had been separately robbed of his wallet as she testified his wallet had not been stolen and a wallet was found in defendant's room.

In addition to this evidence, M.C. testified defendant admitted to shooting someone that night, twice claiming he had "shot the mother fucker." Defendant also said, "I don't know if I killed the mother fucker, but I shot him."

In addition, Fisher, defendant's accomplice, put defendant at the scene of the crime and identified him as the shooter. Despite defendant's claim, the trial court did not exclude this testimony but considered Fisher's many prior convictions in considering Fisher's testimony.

Fisher testified he saw defendant with a .38 caliber revolver. He also testified the night of the shooting, while the two were riding bikes defendant said that people played cards at the victim's home, and they could rob them. Fisher said defendant walked up to the porch and started talking to the victims.

In our original opinion affirming defendant's conviction, this court considered whether Fisher's testimony had the requisite hallmarks of corroboration to be considered by the factfinder in this case. We wrote, "Under section 1111, '[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.'

"Corroborating evidence ' "is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth." ' (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) Both

15

requirements must be met.  The corroborative evidence must both connect the defendant with the crime and satisfy the jury of the accomplice's veracity.  (*People v. MacEwing* (1955) 45 Cal.2d 218[, 224].)

"Independent corroborating evidence ' " 'is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth.' " '  (*People v. Davis* (2005) 36 Cal.4th 510, 543, italics omitted.)"  (*People v. Humphrey, supra*, C052744.)  Based on that standard and the identical record that was before the trial court here, this court has already concluded the evidence was sufficient to connect defendant to the robbery and shooting in such a way as might reasonably satisfy a factfinder that defendant's accomplice, Fisher, was telling the truth.  (*People v. Humphrey, supra*, C052744.)  We agree that remains the case on this record.

While defendant argues inferences from the evidence in the light most favorable to himself, that is not the applicable standard.  Where the evidence is controverted, it is for the trier of fact (the trial court) to sort out what it believes is true and what is not.  Our review ends if there is substantial evidence to support the trial court's findings.  We conclude substantial evidence supports the trial court here.

Next, we turn to the question of whether there is substantial evidence the shooter was engaged in a robbery.  "Robbery is defined as 'the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.'  (§ 211.)  An attempted robbery consists of two elements: (1) the specific intent to rob; and (2) a direct, unequivocal, but ineffectual, overt act towards the commission of the intended robbery."  (*People v. Burgess* (2023) 88 Cal.App.5th 592, 603-604.)

Defendant asserts the evidence establishes that no money was stolen here.  But that is not an element of attempted robbery.  Instead, attempted robbery requires the trial

16

court to find he had the intent to rob and committed an overt act towards the commission of that crime. (*People v. Burgess, supra,* 88 Cal.App.5th at pp. 603–604.)

Here, defendant asserts the evidence "clearly proved that [there] was no[t] [an] attempted robbery." We disagree. R.G. said he heard defendant demand money while holding a gun. B.V.S. saw the shooter speak angrily at the group with the gun in his hand. A.J. saw the man say, "I got the money, I want to play" and then the man brought out a gun and started shooting. Fisher testified defendant told him they could rob the victims who played poker at this house and then veered towards the house where the shooting took place. D.E. testified defendant told her he went over to rip some guys off and that it went bad. This provides substantial evidence for the factfinder to find beyond a reasonable doubt defendant intended to rob his victims and committed an overt act towards that crime.

Defendant's suggestion that this was an illegal gambling game and thus none of the poker players had legal title to the money on the table is legally irrelevant. Title to the property defendant intended to steal is not an element of attempted robbery in this case. (*People v. Burgess, supra*, 88 Cal.App.5th at pp. 603-604.) Defendant's reliance on *People v. Rosen* (1938) 11 Cal.2d 147, 151 is misplaced. That case stands for the proposition that a defendant who in good faith seeks to recapture his or her own money the defendant lost in an illegal game lacks the intent to commit robbery. (See also *People v. Tufunga* (1999) 21 Cal.4th 935, 947.) No evidence suggested defendant ever entered this game or lost any money in it. Thus, he could not have been seeking to recapture his own money in good faith as opposed to robbing the men at the table of their stakes.

Finally, given that defendant was the actual shooter during a felony murder, the trial court had no occasion to examine the possibility that defendant had diminished capacity as a minor. That analysis is appropriate when examining a defendant's culpability as an accomplice who engaged in the act as a major participant who acted

17

with reckless indifference to human life, not as a principal who pulled the trigger. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 486.)

Hearsay

Defendant says the trial court erred in refusing to admit the police reports and the District Attorney's letter to the Parole Board concerning codefendant Fisher's prior record as substantive evidence rather than as impeachment.

The admission of evidence at a section 1172.6 evidentiary hearing is "governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).)

Under Evidence code section 1200, "(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] (b) Except as provided by law, hearsay evidence is inadmissible." Under Evidence Code section 1202, "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

Defendant does not argue that this evidence is not hearsay. Indeed, police reports are textbook examples of hearsay of written statements made out of court to prove the truth of the matters asserted. (See e.g., *People v. Cardenas* (2025) 18 Cal.5th 797, 818.) And having the court consider the documents as proving the matters asserted therein was exactly his goal. Further, defendant failed to cite to the trial court any legal authority that

18

any of this evidence was admissible under an exception to the hearsay rule other than the exception provided under Evidence Code section 1202.

And as noted by our Supreme Court in *People v. Ramos* (1997) 15 Cal.4th 1133, "[a]s a condition precedent to challenging the exclusion of proffered testimony, Evidence Code section 354, subdivision (a), requires the proponent make known to the court the 'substance, purpose, and relevance of the excluded evidence . . . .' This requirement applies equally to establishing a hearsay exception. [Citations.]" (*People v. Ramos, supra*, 15 Cal.4th at p. 1178.) Defendant's failure to follow this rule forfeits this claim of error. (*Ibid.*)

#### Original Trial Court Errors

Defendant attempts to raise several trial errors that are not cognizable on his appeal from the section 1172.6 proceeding. These claims include that the jury was improperly instructed, the trial court utilized an incorrect standard of proof, the original trial court failed to properly follow the law concerning the trial of juvenile offenders, and that his counsel provided ineffective assistance by not pursuing this latter issue.

"Section 1172.6 does not create a right to a second appeal, and [defendant] cannot use it to resurrect a claim that should have been raised in his [direct] appeal." (*People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921, 936.) Whether and how the jury was originally instructed, how the original proceedings were conducted, or how his original trial counsel performed, has nothing to do with whether substantial evidence supports the trial court's finding that he was the actual shooter during an attempted robbery and could still be convicted of felony murder despite the changes to the murder statute.

#### Discovery

Defendant next argues the trial court erred when it declared post-conviction discovery is not available for a section 1172.6 petition. The specific information he sought to discover was impeachment evidence as to Fisher's prior convictions and the

19

lack of a gambling license for the home where the attack occurred. On this point, the trial court stated, it was unaware of any authority to compel discovery in section 1172.6 proceedings and denied the motions on that basis.

Defendant is correct that section 1172.6 allows for post-conviction discovery. (*Garcia v. Superior Court* (2024) 106 Cal.App.5th 1005, 1021-1022.) The trial court thus erroneously concluded otherwise.

Any error, however, was harmless. The trial court specifically took judicial notice of codefendant Fisher's extensive criminal record recited in Exhibit E for purposes of impeachment, including Fisher's juvenile adjudications. The court also assumed that the record would show no gambling license was issued at the property where the incident took place, which was the point of defendant's discovery request. This evidence has no relevance to the question of whether defendant murdered the victim while attempting to rob him. (Evid. Code, § 210 [" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].) Given that the trial court provided defendant with the full benefit of these two items of evidence, no better result could be obtained by allowing additional discovery.

DISPOSITION

The trial court's order denying defendant's petition for resentencing under section 1172.6 is affirmed.

_____\s_____
HULL, Acting P. J.

We concur:

_____\s_____
KRAUSE, J.

_____\s_____
BOULWARE EURIE, J.